**WO**                          NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kenneth Lemaster, | No. CV-13-02017-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Hartford Insurance Company of the Midwest, *et al.*, | |
| Defendants. | |

At issue are the following Motions: Defendants Hartford Insurance Company of the Midwest and Twin City Fire Insurance Co.'s First Amended Memorandum of Law in Support of Motion for Summary Judgment (Doc. 144, Carrier Defs.' Mot.). to which Plaintiff filed a Response (Doc. 151, Resp. to Carrier Defs.' Mot.), and Defendants filed a Reply (Doc. 156, Carrier Defs.' Reply); and Defendants Gallagher Bassett Services, Inc. and Jennifer Green's First Amended Memorandum of Law in Support of Motion for Summary Judgment (Doc. 146, Administrators' Mot.), to which Plaintiff filed a Response (Doc. 152, Resp. to Administrators' Mot.), and Defendants filed a Reply (Doc. 155, Administrators' Reply). The Court finds this matter appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons that follow, the Court denies Hartford Insurance Company of the Midwest and Twin City Fire Insurance Co.'s Motion for Summary Judgment and grants Gallagher Bassett Services, Inc. and Jennifer Green's Motion for Summary Judgment.

1    **I.      BACKGROUND**

2          As a threshold matter, the Court notes that given Plaintiff's and Defendants' less

3    than clear citations and frequent lack of pincites, especially when citing to various

4    documents contained in single exhibits, the Court had to scour the record to find the

5    information the parties tried to reference, causing significant delay in the Court's

6    resolution of the Motions at issue. The Court notes that it was under no obligation to do

7    so. *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). The Court

8    also notes that both parties failed to set forth the facts of this case in a cohesive manner.

9    At trial, the parties must remedy this issue so that a reasonable jury will be able to

10   understand the facts and resolve the claims at issue.

11         The following facts are undisputed unless otherwise indicated.[1] Plaintiff Kenneth

12   Lemaster alleges he sustained an injury while working with R&L Carriers ("R&L") and

13   unloading a ceramic barbeque grill from a truck without a lift gate on December 9, 2011.

14   Plaintiff alleges that Hartford Insurance Company of the Midwest ("Hartford") and Twin

15   City Fire Insurance Company ("Twin City") are both responsible to pay for his injuries as

16   insurers to R&L. Defendants contend that Twin City did not issue a policy of insurance to

17   R&L. Gallagher Bassett Services, Inc. ("Gallagher") is a third party administrator, not an

18   insurance company, and Jennifer Green is an adjuster employed by Gallagher who was

19   assigned to Plaintiff's workers' compensation claim.

20         Gallagher initially accepted Plaintiff's workers compensation claim.  Defendants

21   assert that they paid medical and income benefits to Plaintiff, but Plaintiff contends that

22   Gallagher refused to pay all benefits owed to him based upon his medical records and the

23   Industrial Commission of Arizona's later orders. From January 2012 to October 2012,

24   Plaintiff worked light duty. During that period, wage calculations were made to

25   determine and pay any income benefits due. After Plaintiff returned to work, Gallagher

26

27   _____

          [1] Defendants Hartford, Twin City, Gallagher, and Ms. Green submitted the same

28   Statement of Facts in support of their respective Motions for Summary Judgment. The
     Court considers their Statements of Facts together and references all four Defendants
     collectively as "Defendants" in the Background section.

- 2 -

adjusters continued to monitor wages and determined no additional income benefits were owed based on wages earned and personal vacation time.

On February 5, 2014, a Gallagher adjuster performed a wage calculation of benefits and issued a check on February 10, 2014; benefits were paid through June 4, 2014, when Gallagher states the claim was closed based on a finding that Plaintiff was stationary.[2] Plaintiff has also received long term disability payments since May 2013, which Plaintiff asserts he had to seek because Gallagher refused to issue the required indemnity payments.

### A.      Plaintiff's Medical Treatment History

After Plaintiff sustained his injury on December 9, 2011, he saw numerous doctors both of his own accord and at the request of Gallagher. Generally, Defendants found that the medical reports indicated that Plaintiff was medically stationary without any permanent injury for which further benefits were due, and that his work-related injuries were confined to what he originally reported – an injury to the groin, which was diagnosed as a hernia. Plaintiff states that he initially had pain in his groin and abdomen and that medical reports show he was justified in seeking continued treatment, including physical therapy and pain management. He states that after he reported his injury to R&L on December 14, 2011, he sought medical treatment at Concentra, where he underwent physical therapy and Dr. Jacquelyn Island put him on light duty, diagnosing him with a groin strain and umbilical hernia. Plaintiff testified that Concentra doctors released him in July 2012, advised him that they did not know what was wrong with him, and refused to see him in the future.

Plaintiff saw many other health care providers, including Doctors Zacher, Gagnon, Dilla, and Glass. Plaintiff alleges that Dr. Zacher ordered hernia repair surgery on February 22, 2012, but that Gallagher delayed and did not approve the surgery until

---

[2] A workers' compensation claimant's condition is considered "stationary" when it has reached relatively stable status and nothing further in the way of medical treatment is indicated to improve the condition. *Tsosie v. Indus. Comm'n of Ariz.*, 905 P.2d 548, 549 (Ariz. Ct. App. 1995).

March 22, 2012. Plaintiff underwent a hernia repair with Dr. Zacher on March 22, 2012, and Dr. Zacher found Plaintiff had recovered from hernia surgery as of May 2, 2012. Plaintiff alleges that after surgery, he returned to Dr. Island for treatment, and she noted that Plaintiff continued to suffer pain in his abdomen and placed him on light work duty.

On May 15, 2012, Dr. Gagnon reported that he found no strong evidence of any ongoing nerve root impingement and Plaintiff's hernia had healed. Dr. Gagnon recommended physical therapy, and estimated Plaintiff would be stationary in four to six weeks with no permanent impairment. On June 4, 2012, Dr. Gagnon performed a follow up evaluation and found that objectively, Plaintiff's issues were subacute, even though Plaintiff continued with subjective complaints. On June 25, 2012, Dr. Gagnon opined Plaintiff had no subjective improvements and agreed to order an MRI.

Dr. Gary Dilla, who initially performed an Independent Medical Examination ("IME") on Plaintiff on July 19, 2012, issued several reports, with changing medical opinions. Based on the July 19, 2012 IME, Dr. Dilla diagnosed Plaintiff with a diffuse left lower quadrant abdominal/groin sprain/strain, persistent diffuse left lower quadrant abdominal, groin and medial thigh tenderness of undetermined etiology, and post umbilical hernia surgical repair. Dr. Dilla was unable to explain Plaintiff's widespread non-localizing pain and withheld further opinion pending review of Plaintiff's MRI from July 18, 2012. Upon review of the MRI, which Ms. Green sent to Dr. Dilla on July 26, 2012, Dr. Dilla issued an addendum dated August 8, 2012, in which he found it was not clear what the exact objective basis of Plaintiff's ongoing symptoms were and found no objective basis for work restrictions. He recommended that Plaintiff seek an evaluation from general surgeon Dr. Lou Glass and consultation with a pain management interventionalist. Plaintiff alleges that Dr. James Madura examined him on October 4, 2012 and agreed with Dr. Dilla's opinion that Plaintiff suffered an ilioinguinal nerve injury, but Plaintiff only cites to his own declaration to support this assertion. On August 21, 2102, Ms. Green forwarded Dr. Dilla's August 8, 2012 report to Dr. Gagnon and authorized treatment consistent with the report.

- 4 -

1    From November 2012 to February 2014, Plaintiff received numerous treatments at
2    Arizona Pain Specialists ("APS"), including nerve block treatments, from Dr. McJunkin
3    as well as other doctors.

4    On November 19, 2012, Dr. Glass conducted an IME. Dr. Glass opined that there
5    was no evidence of ilioinguinal nerve entrapment syndrome and no ongoing medical
6    treatment was necessary for the work-related injury. He also opined that Plaintiff was
7    medically stationary with no permanent impairment and that there was no need for work
8    restrictions or supportive care from a general surgery standpoint.

9    Upon review of Dr. Glass's report, Dr. Dilla wrote another report dated November
10   29, 2012, in which he found: there was no objective explanation for Plaintiff's subjective
11   symptoms; there was no clinical evidence of ilioinguinal nerve entrapment; nerve blocks
12   were not indicated and if performed, were unlikely to result in any symptomatic
13   improvement; and Plaintiff was permanent and stationary, with no evidence of permanent
14   impairment and no need for work restrictions or supportive care. In response, Ms. Green
15   filed a Notice of Claim Status on December 4, 2012, and testified that she understood that
16   Dr. Dilla released Plaintiff to full duty and found no further medical treatment was
17   necessary. Plaintiff requested a hearing protesting the Notice of Claim Status.

18   On April 2, 2013, Dr. Dilla issued yet another report based on his review of
19   additional medical records including the following: notes from APS, including notes
20   regarding Dr. McJunkin's treatment of Plaintiff; a neurological evaluation by
21   Dr. Sivakumar; MRIs of the lumbar spine, thoracic spine, sacrum, and coccyx (tailbone);
22   electrodiagnostic studies; and ilioinguinal/iliohypogastric nerve blocks. Dr. Dilla opined
23   he did not believe Plaintiff suffered a lumbar spine injury and he was not optimistic that
24   nerve block treatments would provide lasting benefit. Dr. Dilla indicated he received a
25   correspondence from Lisa LaMont, administrative counsel for Hartford and R&L, on
26   March 26, 2013, presumably regarding the additional medical records. Plaintiff contends
27   that Gallagher waited months to provide Dr. Dilla with the additional records, specifically
28   those regarding Dr. McJunkin. Defendants aver there is no indication that Gallagher had

Dr. McJunkin's records to provide to Dr. Dilla at the time Plaintiff indicates and, as support, note that on April 9, 2013, Ms. LaMont communicated to the Gallagher adjusters that she needed to secure Dr. McJunkin's medical records. Plaintiff alleges that Ms. Green preemptively decided she would file the Notice of Claim Status and only used Dr. Dilla to "go get an opinion to back up our decision" and for "final closure."

Plaintiff did not appear for several scheduled medical appointments with Dr. Gagnon and Dr. Zacher in July and September of 2012. Plaintiff alleges that he did not seek medical treatment at that time because Defendants denied his treatment pending the IME and he was awaiting Dr. Dilla's treatment recommendation. Ms. Green sent Plaintiff a letter dated October 2, 2012, requesting an update on his medical care because she had no records since July 9, 2012. Plaintiff states he responded that he was seeking treatment from a pain specialist – presumably APS – at Dr. Dilla's recommendation. On October 30, 2012, APS called Ms. Green seeking approval for Plaintiff's treatment, but Ms. Green informed APS that it was not an authorized physician under the Arizona Workers' Compensation Act.

Plaintiff was also scheduled for another IME on August 22, 2013, which did not occur. Defendants allege that the IME doctors refused to conduct the IME due to the perceived threat of litigation by Plaintiff, but Plaintiff contends that the doctor refused to examine him because his wife was present and wanted to record the IME.

**B.     Industrial Commission of Arizona Proceedings**

On November 7, 2012, Plaintiff petitioned the Industrial Commission of Arizona ("ICA") to change doctors from Concentra to APS. Defendants allege Plaintiff took this action because his other doctors, Dr. Zacher and Dr. Gagnon, had released and/or stopped treating him, and Plaintiff wanted to continue treatment. Plaintiff contends he filed the petition because Gallagher cancelled his appointments with Dr. Gagnon and Dr. Zacher in response to Plaintiff seeking treatment from APS on October 30, 2012. The ICA approved Plaintiff's request to change treating doctors and, on November 16, 2012, Gallagher and R&L protested the decision, contending Plaintiff was seeking pain

1   management for issues outside of the scope of the accepted claim. On December 4, 2012,

2   Ms. LaMont advised Ms. Green to issue a Notice of Closing Status based on Dr. Dilla's

3   report finding Plaintiff was stationary and without a permanent impairment. On

4   December 11, 2012, Plaintiff requested a hearing with the ICA contesting the Notice.

5           On April 9, 2013, Ms. LaMont advised Ms. Green that she would be taking

6   "aggressive steps to move forward on this claim, anticipating that we will soon receive an

7   Award . . . granting continuing benefits." Ms. LaMont stated that she needed to secure

8   medical records from Dr. McJunkin to determine whether any benefits would be owed,

9   recommended a nurse case manger be assigned to the file, stated she would be meeting

10  with Dr. Dilla, and suggested surveillance to document Plaintiff's level of activity.

11  **1.    May 24, 2013 ICA Decision**

12          On May 24, 2013, the ICA entered an award for Plaintiff, determining that he was

13  in need of further active medical care and entitled to change doctors. The ICA ordered

14  Plaintiff be awarded: 1) medical, surgical and hospital benefits, as provided by law, from

15  December 9, 2012, until such time Plaintiff's condition is determined to be medically

16  stationary; 2) temporary total or temporary partial disability compensation benefits, as

17  provided by law, from December 9, 2012, until such time as Plaintiff's condition is

18  determined to be medically stationary; and 3) a change in doctor from Concentra to APS

19  effective November 14, 2012.

20          Defendants did not pay income benefits following the ICA award. Defendants

21  argue they did not pay benefits because the ICA decision did not specify a payment

22  amount or dates of disability. Gallagher adjuster, Mr. Messner, stated he found the ICA

23  award vague because the ICA "indicated that [Plaintiff] was entitled to some form of

24  benefits, but they did not indicate as to what they were." (Doc. 145, DSOF, Ex. 3 at 88:4–

25  18.) He also stated that Gallagher was only obligated to follow the ICA award "for the

26  most part" and that he needed to know Plaintiff's work status for the prior year before he

27  could issue any payment. (Doc. 101, Ex. 25 at 58:16–18.) In Mr. Messner's notes dated

28  June 11, 2013, he stated "[w]e currently do not have anything that states the [Plaintiff] is

completely out of work so it is unknown what TTD/TPD, if any would be owed. It will depend on the outcome of the IME and determining what body parts are related." (DSOF, Ex. 7-1 at 65.) On June 19, 2013, Mr. Messner hired a field nurse case manager to assist in securing medical records and a treatment plan.

Plaintiff contends that the May 24, 2013 ICA award directly provided for benefits, provided specific dates, and found that Plaintiff was not stationary, all of which should have resulted in a payment of income benefits. Plaintiff also argues that Mr. Messner never requested the off-work reports because he already possessed and/or had access to them, but Plaintiff provides no evidence to support this assertion. Plaintiff contends that Mr. Messner scheduled additional IMEs in order to control treatment costs, citing to Mr. Messner's statement that "I really, really need to find out where he is currently treating and get a current treatment plan prior to 7-9-13 if that is possible." (DSOF, Ex. 7-1 at 67.)

### 2.    April 4, 2013 ICA Hearing and December 5, 2014 ICA Decision

On April 4, 2013, the ICA held a hearing at which Dr. Dilla testified that he was changing his November 29, 2012 opinion after reviewing additional records. He stated the relief Plaintiff experienced after Dr. McJunkin's diagnostic nerve blocks "suggested that perhaps either the ilioinguinal or iliohypogastric nerve was the source of some of [Plaintiff's] pain, which was, kind of my clinical impression when I first did my IME." (DSOF, Ex. 8 at 34.) Approximately two weeks after the ICA hearing, Dr. Dilla wrote a report stating that he found there was no objective structural abnormality due to the compensable injury that would require any work restriction, but the ICA did not consider this evidence because it was submitted after the hearing.

Gallagher and Ms. LaMont cited several reasons as to why they did not pay income benefits to Plaintiff in 2013 and 2014. In a letter to the ICA Judge dated July 8, 2013, Ms. LaMont indicated that payment was being refused based on Dr. Dilla's notes that there was no basis for work restrictions due to Plaintiff's nerve condition. Ms. LaMont stated Plaintiff had been seeking treatment for a variety of other orthopedic conditions that were not originally part of the industrial injury, and Defendants had set up

an IME to determine whether Plaintiff's additional conditions were related to the industrial injury. On January 30, 2014, Mr. Messner documented that no income benefits were being paid because "our doctor" felt Plaintiff was capable of working full duty, but that benefits would be reinstated effective the date of the IME.

On June 24, 2014, Gallagher issued a Notice of Claim Status reflecting that compensation and medical treatment was terminated on June 5, 2014, because Plaintiff was discharged and there was no permanent disability.

On December 5, 2014, the ICA issued a second decision finding that Plaintiff sustained a compensable hernia injury and was entitled to no more than two months of temporary compensation pursuant to Arizona's hernia statute, A.R.S. § 23-1043, with credit to the carrier for any overpayment. At that time, Plaintiff had already received more than two months of temporary compensation.

### 3.      April 3, 2015 ICA Decision

On April 3, 2015, the ICA issued a third decision. The ICA found that Plaintiff's complications to his iliohypogastric and iloinguinal nerves as a result of his industrial hernia entitled Plaintiff to benefits other than the limited benefits under the Arizona hernia statute. The ICA stated that because damage to the nerves is a compensable consequence of the industrial claim, Plaintiff may be entitled to disability benefits if he was given work restrictions or took time off work for the consequence. In reaching its decision, the ICA adopted Dr. McJunkin's medical opinion and found that he had placed Plaintiff on light duty status from October 25, 2012 through November 14, 2012, and then placed Plaintiff on a no-work status from November 15, 2012 through November 13, 2013. The ICA determined that Plaintiff was entitled to temporary total disability benefits for November 15, 2012 through November 13, 2013, totaling $31,196.22. Upon petition by R&L, Twin City, and Gallagher, the April 3, 2015 ICA decision is being considered on appeal.

### C.      Insurance Carrier Coverage

The parties contest who insured R&L at the time of Plaintiff's accident – Twin City or Hartford. Plaintiff contends that the two entities should be liable as Plaintiff's workers compensation insurers, because they are referred to interchangeably in the relevant insurance documents and the ICA continually sent notifications to both companies. Hartford and Twin City argue that Twin City did not issue a policy of insurance to R&L.

Some insurance documents submitted, including ICA decisions and Notice of Claim Status reports, note Twin City as the insurer, and others note Hartford. Mr. Messner and Ms. Green stated that they did not deal with the insurer and/or did not know who the insurer was on Plaintiff's claim while they worked on the claim.

### D.      Plaintiff's Financial, Emotional and Physical Damages

Plaintiff alleges that, because of Defendants, he suffered financial, psychological, medical and emotional damages. Defendants contend that Plaintiff has not suffered financial damages due to their actions. They note that Plaintiff is under no threat of foreclosure, has never filed for bankruptcy, has not had credit declined or a loan refused, and is not delinquent with credit cards. Plaintiff does not dispute these contentions, but states that because he was unable to work, he was forced to spend his savings and retirement funds, lost his commercial driver's license, had bills that went into collections, had to incur attorney's fees, and had to pay for this own medical treatment, costing at least $11,817.78.

Plaintiff argues that with timely, proper treatment, he likely would have been able to return to some level of employment, but has been out of work completely for nearly two years. Based on the advice of his doctors, Plaintiff believes he will never be able to return to his line of work or level of compensation. He alleges the delay in medical treatment caused him to suffer unnecessary pain. Plaintiff states that his pain impacts his daily life, and that emotionally, he has suffered from extreme stress, high anxiety, and

1  strained relationships with his family. Finally, Plaintiff alleges that Dr. McJunkin testified

2  that the delay in care caused Plaintiff pain, suffering and physical harm

3  Addressing Plaintiff's psychological and emotional damages claims, Defendants

4  note Plaintiff was discharged from the military because he was found psychologically

5  dangerous, that Plaintiff's doctor has suggested he seek psychiatric care, and that Plaintiff

6  and his wife have not sought marriage counseling. Plaintiff does not dispute these facts.

7  **II.   LEGAL STANDARD**

8  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

9  appropriate when: (1) the movant shows that there is no genuine dispute as to any

10  material fact; and (2) after viewing the evidence most favorably to the non-moving party,

11  the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v.*

12  *Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285,

13  1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect

14  the outcome of the suit under governing [substantive] law will properly preclude the

15  entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16  A "genuine issue" of material fact arises only "if the evidence is such that a reasonable

17  jury could return a verdict for the non-moving party." *Id.*

18  In considering a motion for summary judgment, the court must regard as true the

19  non-moving party's evidence if it is supported by affidavits or other evidentiary material.

20  *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not

21  merely rest on its pleadings; it must produce some significant probative evidence tending

22  to contradict the moving party's allegations, thereby creating a material question of fact.

23  *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative

24  evidence in order to defeat a properly supported motion for summary judgment); *First*

25  *Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

26  "A summary judgment motion cannot be defeated by relying solely on conclusory

27  allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

28  1989). "Summary judgment must be entered 'against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III.   ANALYSIS

### A.   Good Faith and Fair Dealing Claims Against Hartford and Twin City

Plaintiff claims that Defendants Hartford and Twin City (collectively, "Carrier Defendants"), as Plaintiff's workers compensation insurers, breached their duty of good faith and fair dealing by refusing to properly investigate and effectively denying Plaintiff's medical care and other benefits claims without any reasonable basis. (Doc. 49, SAC at 10–11.) Arizona law allows a workers compensation claimant to bring an action against his employer's workers compensation insurer for breach of the duty of good faith and fair dealing. *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1004 (D. Ariz. 2013) (citing *Mendoza v. McDonald's Corp.,* 213 P.3d 288, 298 (Ariz. Ct. App. 2009)). "The duty of good faith arises because . . . implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Id*. In addition, the Carrier Defendants may be liable for Gallagher's actions since they cannot delegate their duty of good faith. *See Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1166 (D. Ariz. 2014).

Arizona employs a two-pronged test to determine whether a claimant has proven a bad faith insurance claim. *See id*. at 1167–69 (citing *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986)). First is an objective inquiry: did the insurer act unreasonably toward the insured? *Id*. at 1168. Second is a subjective inquiry: did the insurer act knowingly or with reckless disregard as to the reasonableness of its actions? *Id*. at 1169. "Unreasonable actions include failure to 'immediately conduct an adequate investigation,' failure to 'act promptly in paying a legitimate claim,' 'forc[ing] an insured to go through needless adversarial hoops to achieve its rights under the policy,' 'lowball[ing] claims,' and similar conduct." *Demetrulias*, 917 F. Supp. 2d at 1004 (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000)).

Arizona law requires insurers to give "equal consideration" to the needs of their insureds, but insurers can challenge claims that are "fairly debatable." *Id*. For the second subjective prong, the intent required is the "evil hand" or intent to do the act. *Id*. at 1005. The insurer need not intend to harm the insured, but only "must intend the act or omission and must form that intent without reasonable or fairly debatable grounds." *Id*. The requisite "[i]ntent is established if the insurer lacked a 'founded belief' that its conduct was permissible," and a "founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Id*.

The Court now determines whether there is sufficient evidence from which reasonable jurors could conclude that Hartford and Twin City, acting through Gallagher, acted unreasonably in the investigation, evaluation, and processing of Plaintiff's claim, and either knew or were conscious of the fact that the conduct was unreasonable. *See Zilisch*, 995 P.2d at 280. In the SAC, Plaintiff alleges that the Carrier Defendants intentionally denied and terminated workers' compensation benefits without a reasonable basis, failed to perform an adequate and reasonable investigation, unreasonably interpreted their obligations under the Arizona Workers' Compensation Act, abused the ICA process, needlessly compelled Plaintiff through litigation, forced Plaintiff to accept a lower amount of benefits owed, and placed their financial interests above Plaintiff. (SAC at 10-11.) The Carrier Defendants contend that they are entitled to summary judgment because the evidence shows there was a reasonable basis for their actions. (Carrier Defs.' Mot. at 7.) They argue that various doctors determined Plaintiff was medically stationary and the ICA decisions did not support providing additional benefits where one decision lacked sufficient detail and a later decision only provided for limited compensation already paid to Plaintiff. (*See* Carrier Defs.' Mot. at 7-11.) In response, Plaintiff contends the evidence shows that Gallagher abused the use of IMEs, cited improper reasons to deny and delay payment, and failed to timely share medical reports, especially APS reports, to Plaintiff's other doctors. (*See* Resp. to Carrier Defs.' Mot. at 1–2.)

1    Viewing the summary judgment evidence in a light most favorable to Plaintiff, the
2    Court finds Plaintiff has proffered sufficient evidence to create a genuine dispute as to
3    whether the Carrier Defendants acted unreasonably in the investigation and processing of
4    Plaintiff's claim. Despite the May 2013 ICA decision that awarded Plaintiff medical,
5    surgical and hospital benefits, as well as temporary total or partial disability
6    compensation benefits from December 9, 2012 until such time Plaintiff's condition was
7    determined to be medically stationary, there is sufficient evidence to create a genuine
8    dispute as to whether Gallagher attempted, in earnest, to pay Plaintiff in accordance with
9    this decision. Gallagher's adjuster testified that he thought the award was vague and that
10   he did not need to fully comply with it. The adjuster acknowledged he needed more
11   information to carry out the May 2013 decision, but the evidence shows that minimal or
12   no actions were taken to obtain the additional information.

13   The Court acknowledges that there were various medical reports, including IME
14   reports, finding Plaintiff was stationary and ICA decisions at issue in this case that may
15   have caused confusion. The Court, however, finds a genuine dispute arises as to whether
16   the May 2013 ICA decision was sufficiently clear to indicate benefits were owed to
17   Plaintiff and whether Carrier Defendants failed to perform an adequate investigation in
18   response, and rather, effectively ignored the ICA decision. "[W]hile fair debatability is a
19   necessary condition to avoid a claim of bad faith, it is not always a sufficient condition."
20   *Zilisch*, 995 P.2d at 280. The inquiry remains "whether there is sufficient evidence from
21   which reasonable jurors could conclude that in the investigation, evaluation, and
22   processing of the claim, the insurer acted unreasonably and either knew or was conscious
23   of the fact that its conduct was unreasonable." *Id*. Because the evidence shows Gallagher
24   may not have taken prompt steps to attempt to comply with the May 2013 ICA decision,
25   forcing Plaintiff to go through further adversarial hoops, reasonable jurors could find that
26   the Carrier Defendants, acting through Gallagher, acted unreasonably. *See id*.

27   The Court must also consider whether the insurer lacked a "founded belief" in the
28   appropriateness of the course of action, in other words, whether the insurer "subjectively

1    knew that it was acting unreasonably or acted with such reckless disregard that such

2    knowledge may be imputed to it." *Temple*, 40 F. Supp. 3d at 1169. Although the founded

3    belief determination is usually for the jury to determine, if a plaintiff has offered no

4    significantly probative evidence that calls into question the insurer's subjective founded

5    belief, the Court may rule on the issue as a matter of law. *Id.*

6         Here, because Plaintiff proceeds on the theory that his claim was delayed due to

7    Gallagher's failure to adequately investigate his claim, the failure to investigate theory

8    overlaps in the first two elements of the bad faith analysis. The evidence of Gallagher's

9    failure to investigate and obtain further information to effectuate the May 2013 ICA

10   Award may support both the objective unreasonableness of the insurer's actions and the

11   existence of the subjective "evil hand." *See Demetrulias*, 917 F. Supp. 2d at 1006.

12   Plaintiff also cites statements made by Ms. LaMont, Ms. Green, and Mr. Messner that

13   Plaintiff alleges indicate a subjective knowledge that their actions were unreasonable.

14   The Court finds there is sufficient evidence for a reasonable jury to find the Carrier

15   Defendants, acting through Gallagher, failed to undertake an investigation adequate to

16   determine whether their position to not follow the May 2013 ICA was tenable, and thus

17   the subjective prong of the bad faith claim is also met.

18        Accordingly, there is a genuine dispute as to whether the Carrier Defendants acted

19   in bad faith with regard to Plaintiff's claim.

20        **B.     Proper Insurance Carrier**

21        The Carrier Defendants argue that Twin City did not issue a policy of insurance to

22   Plaintiff's employer, R&L, and accordingly Twin City cannot be held liable for the

23   alleged failure to act in good faith. (Carrier Defs.' Mot. at 5.) In support, the Carrier

24   Defendants provide an insurance contract with a policy period of October 1, 2012 to

25   October 1, 2013, which indicates that Trumbull Insurance Company is R&L's insurer.

26   (DSOF, Ex. 9.) However, Plaintiff's injury occurred in December 2011 and would not be

27   covered under the policy period in that contract.

28

1    The Carrier Defendants also argue that their Motion should be granted because
2    Plaintiff has only provided documents created by third parties to support Plaintiff's
3    argument that Hartford and Twin City should both be held liable. (Carrier Defs.' Mot.
4    At 5.) The ICA sent a Notification of Workers Compensation Claims dated February 2,
5    2012 that indicated Hartford as the insurer. (DSOF, Ex. 7-2 at 11.) Gallagher filed a
6    Notice of Claim Status on May 10, 2012 indicating Hartford as the insurer (DSOF, Ex. 7-
7    2 at 12), but filed another Notice of Claim Status on December 4, 2012 indicating Twin
8    City as the insurer (DSOF, Ex. 7-2 at 14). The May 24, 2013 ICA decision indicates
9    Hartford is the insurer (DSOF, Ex. 7-2 at 41–50), but the December 5, 2014 ICA decision
10   (DSOF, Ex. 7-2 at 53–56) and the April 3, 2015 decision, indicate Twin City is the
11   insurer (DSOF, Ex. 7-2 at 68–73). In addition, R&L and Twin City/Gallagher filed the
12   petition for review of the ICA decisions on May 4, 2015. (DSOF, Ex. 7-2 at 61–62.) The
13   Court finds that these documents showing the ICA's and Gallagher's own use of Hartford
14   and Twin City interchangeably as insurers shows there is a genuine dispute as to who was
15   R&L's insurer at the time of Plaintiff's injury. Because the above documents are unclear,
16   and because the Carrier Defendants have not provided evidence clearly establishing that
17   Twin City did not have an insurance policy with R&L at the relevant time, the Carrier
18   Defendants have failed to show there is no genuine dispute as to this issue.[3]

19                  **C.      Punitive Damages Claim Against the Carrier Defendants**

20          A plaintiff may receive punitive damages in a bad faith insurance action if there
21   are "circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or
22   evil motive on the part of the defendant, or such a conscious and deliberate disregard of
23   the interests of others that the conduct may be called wilful or wanton." *Demetrulias*, 917
24   F. Supp. 2d at 1010. Punitive damages are restricted to those cases in which the

---

25          [3] The Carrier Defendants also argue that the ICA never issued an award against
26   Twin City, and thus Plaintiff has not exhausted his administrative remedies to secure a
     finding that Twin City is responsible for payment of workers' compensation benefits.
27   (Carrier Defs.' Mot. at 5.) The ICA did in fact enter two awards for Plaintiff against Twin
     City/Gallagher in the December 5, 2014 and April 3, 2015 ICA decisions. (DSOF, Ex. 7-
28   2 at 53–56, 68–73.) Moreover, given the multiple inconsistencies cited above, the Court
     finds the issue of who is the actual insurer will be properly placed before a jury.

- 16 -

defendant's conduct was guided by evil motive. *Temple*, 40 F. Supp. 3d at 1171. Summary judgment on the question of punitive damages "must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence; summary judgment should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence." *Id.* at 1166.

In order to establish a claim for punitive damages, Plaintiff must provide evidence that supports a showing that the Carrier Defendants either "(1) intended to cause injury; (2) engaged in wrongful conduct motivated by spite or ill will; or (3) acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others, even though defendant had neither desire nor motive to injure." *Id*. at 1171. Upon the Court's threshold review of the evidence, the Court finds that Plaintiff has proffered sufficient evidence to create a genuine dispute as to the third basis. The Carrier Defendants "must show there is a complete failure of proof, *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, such that no reasonable jury could find the requisite evil mind required for punitive damages by clear and convincing evidence." *Id*.

Here, taking inferences in favor of Plaintiff, Plaintiff has proffered evidence that suggests that the Carrier Defendants acted to serve their own interests by not taking prompt or investigatory actions to effectuate the May 2013 ICA decision. Despite the Carrier Defendants' argument that the decision was too vague, the evidence shows that the decision did state dates and types of benefits awarded to Plaintiff and that the Carrier Defendants could have taken steps to obtain the clarity they claim was required in order to comply with the decision. Plaintiff's proffered evidence also suggests that the Carrier Defendants knew that their lack of affirmative steps to effectuate the May 2013 ICA decision could injure Plaintiff's right to obtain benefits because his award would at least be delayed, and possibly disregarded, and yet, the evidence shows the Carrier Defendants may have consciously disregarded this risk by not promptly investigating. The Court acknowledges that Plaintiff's evidence showing the Carrier Defendants' "evil mind" is

quite limited, but it cannot say that no reasonable jury could conclude by clear and convincing evidence that the Carrier Defendants acted to serve their own interests while consciously disregarding the substantial risk that their conduct might significantly injure Plaintiff's rights. As a result, the Carrier Defendants are not entitled to summary judgment as to Plaintiff's request for punitive damages.

### D. Aiding and Abetting Claim Against Gallagher and Ms. Green

Under Arizona law, "claims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Temple*, 40 F. Supp. 3d at 1170 (citing *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz. 2002), *as corrected* (Apr. 9, 2002)). The party charged with aiding and abetting must have knowledge of the underlying tortious violation, and knowledge can be inferred from the circumstances. *Id*.

The parties both cite to numerous cases that they argue support either the proposition that Arizona law does or does not permit an aiding and abetting cause of action against a third party administrator, like Gallagher, and/or individual adjuster, like Ms. Green. The Court has reviewed the cases the parties have cited and is guided by a recent decision in this district that also addressed such a cause of action. *See Lambert v. Liberty Mut. Fire Ins. Co.*, No. CV-14-00521-JWS, 2014 WL 5432154, at *3 (D. Ariz. Oct. 24, 2014). As *Lambert* notes, "[a]lthough federal courts in this district have consistently held that Arizona law would permit a claim against an adjuster [or third party administrator] for aiding and abetting an employer's bad faith, no conclusive Arizona case law exists." *Id*. However, even assuming that a third party administrator or adjuster may be liable for aiding and abetting a violation of the duty of good faith and fair dealing, the plaintiff must still show the elements of a *separate tort* by the third-party administrator or adjuster against whom the claim of aiding and abetting is being alleged.

- 18 -

*See, e.g.*, *Ortiz v. Zurich Am. Ins. Co.*, No. CV-13-02097-JAT, 2014 WL 1410433, at *3 (D. Ariz. Apr. 11, 2014) ("Because Plaintiff alleges the same actions give rise to both the bad faith claim and the aiding and abetting claim, Plaintiff has failed to state a claim against [the third party administrator] or [the adjuster]."); *Haney v. ACE Am. Ins. Co.*, No. CV-13-02429-DGC, 2014 WL 1230503, at *4 (D. Ariz. Mar. 25, 2014); *Jones v. Colo. Cas. Ins. Co.*, No. CV-12-1968-JAT, 2013 WL 4759260, at *5 (D. Ariz. Sept. 4, 2013); *Young v. Liberty Mut. Grp., Inc.,* No. CV-12-2302-JAT, 2013 WL 840618, at *3–4 (D. Ariz. Mar. 6, 2013).

While Plaintiff alleges in the SAC that the Carrier Defendants have breached the duty of good faith and fair dealing, committed violations of the Arizona Workers' Compensation Act, and violated other duties under Arizona law arising from their workers compensation coverage contracts, which could amount to tortious acts, Plaintiff does not allege any claims against Gallagher and Ms. Green other than aiding and abetting and punitive damages. (*See* SAC at 10-15.) Plaintiff's separate aiding and abetting claim against Gallagher and Ms. Green requires Plaintiff to provide evidence that these parties took a *separate* action in concert with the actions giving rise to Plaintiff's claim against the Carrier Defendants. In other words, if Plaintiff only shows that the alleged actions that constitute the breach of the underlying tortious act are the same as those that constitute the third-party administrator's and adjuster's assistance or encouragement, Plaintiff's claim fails.

The Court finds Plaintiff has failed to provide any facts to create a genuine dispute as to whether Gallagher and Ms. Green performed separate actions that substantially assisted or encouraged the Carrier Defendants' alleged breaches. *See Ortiz*, 2014 WL 1410433, at *3; *see also Morrow v. Boston Mut. Life Ins. Co.*, No. CV-06-2635-SMM, 2007 WL 3287585 (D. Ariz. Nov. 5, 2007). In *Morrow*, the plaintiff made two distinct allegations against two separate defendants – the carrier's selection of a biased doctor as part of the claims handling, and the doctor's provision of a biased and unsupported opinion. *Morrow*, 2007 WL 3287585, at *5. Unlike *Morrow*, Plaintiff fails to allege,

much less produce any evidence, that Gallagher and Ms. Green performed any separate action akin to the separate actions in *Morrow*. The actions that Plaintiff cites in support of the aiding and abetting are the same actions that give rise to the bad faith claim that the Carrier Defendants failed to conduct an adequate investigation and make timely benefit payments. *See, Ortiz,* 2014 WL 1410433, at *3; *Young*, 2013 WL 840618, at *3; *Lambert*, 2014 WL 5432154, at *3. Accordingly, the Court will grant Gallagher and Ms. Green's Motion for Summary Judgment as to Plaintiff's aiding and abetting claims against them.

### D.    Punitive Damages Claim Against Gallagher and Ms. Green

Plaintiff alleges that Gallagher and Ms. Green are liable for punitive damages. (Resp. to Administrators' Mot. at 10.) As Plaintiff concedes, the only basis for his punitive damages claim against Gallagher and Ms. Green is his aiding and abetting claim. (Resp. to Administrators' Mot. at 10.) Because Gallagher and Ms. Green are entitled to summary judgment on Plaintiff's aiding and abetting claim, they are also entitled to summary judgment on Plaintiff's punitive damages claim. *See Young*, 2013 WL 840618, at *4.

## IV.    CONCLUSION

The Court finds a genuine dispute exists as to whether the Carrier Defendants breached their duty of good faith and fair dealing by refusing to properly investigate and effectively denying Plaintiff's medical care and other benefits claims without any reasonable basis. The Court also finds Plaintiff has proffered sufficient evidence from which a reasonable jury could conclude by clear and convincing evidence that the Carrier Defendants acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure Plaintiff's rights, and thus the jury could find punitive damages against the Carrier Defendants are appropriate. Accordingly, the Carrier Defendants' Motion for Summary Judgment with respect to these claims is denied.

1      No genuine dispute of material fact as to Plaintiff's claims against Gallagher and

2  Ms. Green exists, and they are thus entitled to summary judgment on those claims.

3      IT IS THEREFORE ORDERED denying Defendants' Hartford Insurance

4  Company of the Midwest and Twin City Fire Insurance Co.'s First Amended

5  Memorandum of Law in Support of Motion for Summary Judgment (Doc. 144). This

6  matter will proceed to trial on Plaintiff's claims against these Defendants, and the Court

7  will set a Pretrial Conference by separate order.

8      IT IS FURTHER ORDERED granting Defendants' Gallagher Bassett Services,

9  Inc. and Jennifer Green's First Amended Memorandum of Law in Support of Motion for

10  Summary Judgment (Doc. 146). Plaintiff's claims against these Defendants are

11  dismissed.

12      Dated this 23rd day of February, 2016.

13

14                                         Honorable John J. Tuchi

15                                         United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28